✓ FILED ___ ENTERED
___ LOGGED _____ RECEIVED

9:28 am, Nov 16 2021

AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ Deputy

# UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF MARYLAND

<table>
<tr>
<td>

IN THE MATTER OF THE APPPLICATION OF THE UNITED STATES OF AMERICA FOR SEARCH WARRANTS:

**1213 Cheshire Lane**
**Bel Air, Maryland 21015; and**

**2217 E. Churchville Road**
**Suite C**
**Bel Air, Maryland 21015**

</td>
<td>

21-mj-02515-JMC

21-mj-02516-JMC

**Misc. No. _____**


**Filed Under Seal**

</td>
</tr>
</table>

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS

### A.    Affiant

Your Affiant, Daniel Rzepecki, being first duly sworn, deposes and states as follows:

1.     I have been a duly sworn Special Agent with the Federal Bureau of Investigation ("FBI") since June 2008.  During that time, I have been assigned to the Washington Field Office and the Baltimore Field Office, as well as to FBI Headquarters as a Supervisory Special Agent.  I am currently assigned to the complex financial crime squad in Baltimore.  I have received instruction, training, and experience in the investigation of financial institution fraud, health care fraud, corporate fraud, money laundering, and mail/wire fraud.  During the course of conducting and participating in numerous criminal investigations, I interviewed and debriefed witnesses and informants; analyzed bank records, business records, medical records and telephone records; and conducted physical surveillance.  I have used many different types of investigative techniques to collect and analyze evidence, including the preparation and execution of numerous search warrants.

2.      I have personally participated in this investigation and witnessed many of the facts and circumstances described herein.  I have also received information from other law enforcement officers related to this investigation, including special agents with the Internal Revenue Service ("IRS") who are authorized to conduct investigations of Title 26 offenses.  The information set forth in this affidavit is based on my own observations and review of documents, and reliable information provided to me by other law enforcement personnel.  I have set forth only those facts and circumstances necessary to establish probable cause for the issuance of the requested search warrant.  Unless otherwise indicated, all written and oral statements referred to herein are set forth in substance and in part, rather than verbatim.

**B.      Purpose of Affidavit**

3.      This affidavit is being submitted in support of warrants to search the following properties (the **"Subject Properties"**):

1213 Cheshire Lane
Bel Air, Maryland 21015
**("Subject Property 1,"** the residence of Elliott Kleinman)

2217 E. Churchville Road
Bel Air, Maryland 21015
(**"Subject Property 2,"** a retail business known as "Main Street Cigars")

Based on my training and experience and the facts set forth in this affidavit, I submit there is probable cause to believe a search of the **Subject Properties** (more particularly described in Attachments A-1 through A-2) will uncover evidence, fruits, and instrumentalities (more particularly described in Attachments B-1 through B-2) of violations of 18 U.S.C. § 1349 (conspiracy to commit wire and mail fraud ); 18 U.S.C. § 1956(a)(1)(A)(ii)&(B)(i) (money laundering); and 26 U.S.C. § 7201 (tax evasion).  Specifically, I believe a search of the **Subject**

**Properties** will identify evidence of the crimes, aid investigators in the identification of additional co-conspirators, and locate the victim's funds.

### C. Probable Cause to Search the Subject Properties

### 1. The Scheme to Defraud[1]

4.      According to its website, Citrus & Allied Essences, Ltd. ("C&A"), is a family-owned company that formulates and produces oils and extracts used in the food industry. A related company owned by the same family members, Trilogy Essential Ingredients ("TEI"), produces flavoring ingredients and seasonings for the food industry. C&A has a manufacturing facility in Belcamp, Maryland, and TEI has a manufacturing facility in Abingdon, Maryland. The two companies have a combined annual revenue of approximately $150 million (hereinafter, C&A and TEI are collectively referred to as "C&A"). According to C&A management, C&A uses large plastic and metal drums as packaging to ship its flavors and oils. The company buys those drums from several vendors located in various states.

5.      In May 2020, legal counsel for C&A contacted the FBI Baltimore field office to report that C&A was a victim of a scheme to defraud perpetuated by one of its employees, Eugene Andrew DiNoto ("DiNoto"). C&A had retained the services of outside legal counsel and a business consulting firm to conduct an internal investigation, the results of which were provided to the FBI. As the facility manager since 2012, DiNoto was in charge of fulfilling purchase orders at the Belcamp and Abingdon facilities, a job that required him to arrange and negotiate the

---

[1] Title 18 U.S.C. § 1343 makes it a crime for a person, having devised or intending to devise any scheme or artifice to defraud, or to obtain money or property by means of false or fraudulent pretenses, representations or promises, to transmit or cause to be transmitted by means of wire communication in interstate or foreign commerce, any writings, signs or signals for the purpose of executing such scheme or artifice. Similarly, Title 18 U.S.C. § 1341 makes it a crime to send or deliver by the Postal Service or interstate carrier any mail matter for the purpose of executing such a scheme to defraud. Conspiracy to commit mail and wire fraud is prohibited under Title 18 U.S.C. § 1349.

prepurchase and storage of the requisite number of drums needed to ship C&A's product.  The company's review of its business records for years 2015-2020 showed that DiNoto and others had defrauded C&A of millions of dollars by authorizing fraudulent invoices for the purchase of plastic, fiber, and metal drums.  More specifically, C&A discovered that DiNoto had repeatedly approved payment for false or fraudulent invoices submitted by different vendors for drums and services that were never actually provided to C&A.  According to C&A, DiNoto approved the invoices for payment by stamping his name and title on the invoices and signing them.  Based on its preliminary findings, C&A advised that around January 2020, C&A management decided to limit DiNoto's authority to order supplies and approve invoices until C&A could finish its internal investigation.  DiNoto was officially terminated by C&A in August 2020.

6.    Based upon C&A's review of its accounting and inventory records for the previous five years, it concluded that, as a result of DiNoto using his position to authorize payments for inflated drum vendor invoices, the company had paid millions of dollars for drums that it never received.  In other words, the number of drums authorized for purchase by DiNoto was far greater than the number of drums actually used to store and transport the amount of C&A product the company shipped to its customers from the processing facilities.  For example, for years 2017 to 2019, C&A determined that that the company purchased approximately 1.1 million drums, but it sold and shipped product necessitating the use of only about 179,000 drums, so it paid vendors for approximately 900,000 drums that it never received at a cost of approximately $10.35 million.  According to C&A, the overpayments for drums that were never delivered to the facility were the direct result of the interactions and arrangements that DiNoto had with the drum vendors who financially benefitted from those inflated payments.  No other C&A employee had that responsibility during the relevant period.

4

7.      In response to the foregoing findings by C&A, the FBI opened its own investigation in May 2020.  Given the sizeable financial gain realized by certain vendors over the years as a result of DiNoto's overpayments, investigators focused on the question of whether the vendors paid DiNoto a percentage of their gain in the form of a kickback to maintain the ongoing scheme to defraud C&A.  Consequently, investigative agents and an FBI forensic accountant reviewed the financial records of DiNoto and some of the vendors for the relevant period.

**2.      Kickbacks Paid to DiNoto by Drum Vendors**

**a.      Tunnel, Barrel & Drum Company ("TB&D")**

8.      According to DiNoto's wage records and tax returns, his annual salary from C&A for the years 2017 through 2019 was approximately $88,000 per year.  Other than a small profit from an ice cream shop he owned during that period, DiNoto did not report income from any other sources.  However, a review of three bank accounts DiNoto opened at Harford Bank revealed a clear pattern of checks from C&A drum vendors being deposited into those bank accounts.  The bank statements for those accounts reflect DiNoto's prior residence at 2810 Forge Hill Road, Bel Air, Md.  The vast majority of those deposits went into bank account ending in 7822 opened in the name of Sandpiper Enterprises ("Sandpiper"), which is a trade name that DiNoto registered in Maryland in February 2011.  DiNoto's prior residence is still listed as the address for Sandpiper.  Investigators have been unable to find any legitimate business activity being conducted by Sandpiper.  The following is a summary of the checks from Tunnel, Barrel & Drum Company ("TB&D"), one of C&A's drum vendors, that were deposited into Sandpiper's bank account and the other DiNoto bank accounts:

| | |
|---|---|
| 2017 | $913,171 |
| 2018 | $1,023,714 |
| 2019 | $1,119,496 |
| 2020 | $90,064 |
| **Total** | **$3,146,445** |

TB&D is based in New Jersey.  During the foregoing three years, TB&D submitted approximately 436 invoices to C&A seeking payment for purportedly providing the company with drums commensurate with the invoice amounts.  In response, C&A paid TB&D a total of approximately $9 million in reliance on DiNoto's approval of those invoices.[2]  Over the same three years, as noted above, TB&D made direct payments to DiNoto on a regular ongoing basis, about four times a month.

9.      Based upon a review of DiNoto's and TB&D's bank records, as well as other financial records and emails, investigators can find no legitimate business reason for TB&D to make payments to Sandpiper.  Based upon your affiant's training and experience and the results of C&A's internal investigation, there is probable cause to believe that the ongoing and regular payments from TB&D to DiNoto are kickbacks representing DiNoto's share of the inflated portion of the fraudulent invoices he approved on behalf of TB&D.

### b.      Hartford Fibre Drum, Inc. ("Hartford")

10.      Investigators uncovered regular payments to DiNoto from a second drum vendor paid by C&A.  The following is a summary of the checks from Hartford Fibre Drum, Inc. ("Hartford") deposited into Sandpiper Enterprises' bank account and other DiNoto bank accounts:

| | |
|---|---|
| 2017 | $261,658 |
| 2018 | $306,350 |
| 2019 | $310,125 |
| 2020 | $24,400 |
| **Total** | **$902,533** |

Hartford is based in New Jersey, and is affiliated with TB&D.  Both companies have the same resident agent and share the same business address.  During the foregoing three years, Hartford

---

[2] C&A sent all payments to drum vendors via the U.S. Postal Service or commercial interstate carrier.

submitted approximately 141 invoices to C&A seeking payment for purportedly providing the company with drums commensurate with the invoice amounts. In response, C&A paid Hartford a total of approximately $1.86 million in reliance on DiNoto's approval of those invoices. Over the same three years, as noted above, Hartford made payments to DiNoto on a regular ongoing basis, about four times a month.

11.     Based upon a review of DiNoto's and Hartford's bank records, as well as other financial records and emails, investigators can find no legitimate business reason for Hartford to make payments to Sandpiper. As more fully discussed below, the lack of legitimate business activity in Hartford's bank account also suggests it is a shell company set up primarily to facilitate (1) the submission of inflated invoices to C&A and (2) the issuance of checks to DiNoto.

12.     Based upon my training and experience and the results of C&A's internal investigation, there is probable cause to believe that the ongoing payments from Hartford to DiNoto are kickbacks representing DiNoto's share of the inflated portion of the fraudulent invoices he approved on behalf of Hartford. The combined total of checks issued to DiNoto by both TB&D and Hartford is approximately $4,048,978, all of which was deposited into DiNoto's bank accounts.

c.     **Emails Discussing the Kickback Scheme**

13.     A review of DiNoto's work emails showed that he corresponded with TB&D and Hartford about the details of the scheme to defraud C&A.[3] Anthony Urcioli, Jr., and his father Anthony Urciolis, Sr., own TB&D and Hartford. Urciolis, Sr., is the resident agent for both companies. DiNoto sent Urcioli, Jr., emails on June 24, 2016 and July 2, 2018 that had similar

_____

[3] DiNoto's work email account was located in Maryland. All emails from his email account to the drum vendors located in New Jersey were transmitted in interstate commerce.

photographs of handwritten notes attached.  The photographs of the two handwritten notes are copied below:



**Note 1 - July 2, 2018 email**          **Note 2 - June 24, 2016 email**

In the email of July 2, 2018, DiNoto tells Urcioli, Jr., "The numbers in red are what they should have been.  I will call you after I send it."  Based on the content of the email and the information gathered thus far during the investigation, I believe DiNoto is correcting a mathematical error in the calculation of his share of an overpayment that TB&D fraudulently received from C&A based on an inflated invoice.  Note 1 shows "75%" and ""25%" of "$29,265" instead of "20,265."  Judging by the direction of the hand drawn arrows, the 75% share ("$21,949") is payable to DiNoto's company "Sandpiper" Enterprises, already discussed above, and the "25%" share ("$7316") is payable to a second entity called "EDK Management."

14.     As more fully discussed below, EDK are the initials for Elliott Dennis Kleinman ("Kleinman"), the former facilities manager at C&A whose job DiNoto took over in 2012.  "EDK Management" is a reference to Kleinman's company.  According to the company's tax records,

8

Kleinman owns 100% of EDK Management, LTD. The principal office for the company is Kleinman's residence, which is **Subject Property 1**. The address listed on the EDK Management bank account is also **Subject Property 1**. Based on a review of Kleinman's financial records, tax returns and other information, I believe Kleinman was a participant in the kickback scheme for at least as long as DiNoto, which means Kleinman received payments from TB&D well after he left C&A in 2012. For the years 2017 to 2019, bank records reflect that Kleinman regularly received and cashed TB&D checks just like DiNoto. The TB&D checks to Kleinman were payable to EDK Management. The checks were sent to **Subject Property 1** around the same time that TB&D sent checks to DiNoto's residence. The following is a summary of the TB&D checks deposited into EDK Management's business account:

| | |
|---|---|
| 2017 | $347,139 |
| 2018 | $351,331 |
| 2019 | $336,441 |
| **Total** | **$1,034,911** |

Investigators can find no legitimate business reason for the foregoing checks.

15. The second email shown above, dated June 24, 2016, was sent to TB&D about two years before the July 2, 2018 email. Both email attachments show a similar 75/25 split of the kickback money from TB&D made payable to "Sandpiper" and "EDK Management." Furthermore, the writing on Note 1 (July 2, 2018) matches the amount billed on invoices submitted to C&A by TB&D and Hartford around that same time. A review of the writing on Note 1, as discussed below shows, that TB&D and Hartford kicked back 50% of the invoice amount to DiNoto and Kleinman, which, as noted above, they split 75/25.

    i. TB&D invoice #07151, dated June 26, 2018, billed for 313 55g black and white drums at a unit cost of $44 per drum totaling $13,772. By comparison, Note 1 states, "313 @ $22.00 = $6886.00," which represents 50% of the amount TB&D billed C&A with invoice #07151.

ii.     TB&D invoice #07063, dated June 27, 2018, billed for 220 55g tin-lined steel drums at a unit cost of $178 per drum totaling $39,160.   The invoice also included a $3,000 "trucking fee."  By comparison, Note 1 states, "42,160 ÷ 2 = $21,080.00," which represents 50% of the combined total of the $39,160 for tin-lined drums plus the $3,000 trucking fee, or $42,160, the amount TB&D billed C&A with invoice #07063.

iii.    Hartford invoice #09076, dated July 2, 2018, billed for 300 55g black and white drums totaling $13,200.  By comparison, Note 1 states, "Hartford 6,600," which represents 50% of the amount Hartford billed C&A in invoice #09076.

As set forth below, the amounts and names written on Note 1 also match the checks that TB&D and Hartford issued to DiNoto and Kleinman around that same time, which they deposited into their respective Sandpiper and EDK Management bank accounts.

i.      On June 29, 2018 at 2:32PM, TB&D check #6521, in the amount of $15,198, made payable to Sandpiper Enterprise, was deposited into DiNoto's Sandpiper account, which is the same amount written to the right of the word "Sandpiper," on Note 1.

ii.     On June 29, 2018 at 2:36PM, TB&D check #6522, in the amount of $5,067.00, made payable to EDK Management, was deposited into Kleinman's EDK Management's account, which is the same amount written to the right of the words "EDK Management" on Note 1.

iii.    On July 2, 2018 at 3:36PM, Hartford check #2448, in the amount of $6,600.00 made payable to Sandpiper Enterprise was deposited to DiNoto's Sandpiper account ending 7822. That amount matches the amount on the note below the word "Hartford."

### d.     The Delivery of Kickbacks from TB&D and Hartford to Gene DiNoto and Elliott Kleinman Via Federal Express Packages

16.     A further review of the email correspondence between DiNoto and TB&D revealed that they used Federal Express ("FedEx") to execute the scheme to defraud.[4]  For example, on June 19, 2015, a TB&D employee emailed DiNoto and said, "I want to let you know that I am sending Elliott and your FedEx out today for tomorrow's delivery."  As noted above, I believe

---

[4] Federal Express is a commercial interstate carrier in the business of accepting and delivering mail and other packages.

"Elliott" is a reference to Elliot Kleinman, the former C&A facility manager. FedEx could not provide investigators with records dating back to June 2015. However, FedEx did provide delivery records for the five-year period of August 2015 through January 2020. Those records showed that Urcioli of TB&D sent a total of 230 FedEx packages to DiNoto's prior residence, which averages approximately four packages every month.[5]

17.     Additionally, FedEx records from November 2018 through January 2020 show that Urcioli sent 14 packages to Kleinman's residence, **Subject Property 1**. Further review of DiNoto's work email showed multiple occasions when DiNoto would reach out to TB&D and request an early shipment of a FedEx package for various personal reasons, while also providing an update on the status of pending C&A payments for outstanding TB&D invoices.

18.     I compared the dates the FedEx packages were delivered to DiNoto and Kleinman with the dates they deposited their TB&D and Hartford checks into their respective Sandpiper and EDK Management bank accounts. Below are just two of many examples that show how deposits of the TB&D and Hartford checks took place within a day or two after a FedEx package from TB&D or Hartford was delivered to DiNoto's and Kleinman's residences.

     i.     On May 19, 2017 at 10:03AM, FedEx delivered a package to DiNoto's residence at 2810 Forge Hill Road, Bel Air, Maryland. About two hours later, at 11:48AM, TB&D check #5643 in the amount of $7,672, payable to EDK Management, was deposited into Kleinman's EDK Management account. About an hour later, at 12:56PM, TB&D check #5642 in the amount of $17,901 and Hartford check #2362 in the amount of $6,600, both payable to Sandpiper Enterprise, were deposited into DiNoto's Sandpiper bank account.

     ii.     On December 4, 2019 at 10:59AM, FedEx delivered a package to DiNoto's residence at 2810 Forge Hill Road, Bel Air, Maryland. About 2.5 hours later, at 1:35PM, TB&D check #7717 in the amount of $18,771, and Hartford check #2551 in the amount of $6,975, both made payable to Sandpiper Enterprise, were deposited into DiNoto's Sandpiper account. Two days later, on December 6, 2019,

---

[5] More specifically, the first 228 FedEx packages were delivered to DiNoto's prior residence at 2810 Forge Hill Road, Bel Air, MD, and the last two deliveries were sent to his prior residence at 2008 Gumtree Terrace, Bel Air, MD.

at 8:59AM, TB&D check #7718, in the amount of $6,257 made payable to EDK Management, was deposited into Kleinman's EDK Management account.

19.    In sum, based on the foregoing facts, I believe the kickback payments to DiNoto and Kleinman from TB&D and Hartford, representing 50% of the inflated invoice amounts, were routinely delivered by FedEx to DiNoto's and Kleinman's residences, including **Subject Property 1**, between 2015 and 2020, in violation of 18 U.S.C. § 1349.



21.    According to C&A's records, between September 2016 and December 2019, ▮ submitted 353 invoices for payment.  According to ▮s bank records (Bank of America account #4508), C&A paid ▮ more than $7.6 million, which made C&A the second biggest client of ▮.  DiNoto approved all the ▮ invoices for payment.

22.    A C&A work email between DiNoto and ▮., showed that ▮, like TB&D and Hartford, delivered packages to DiNoto's personal residence for no apparent reason.  The email sent to ▮ at ▮ on November 20, 2017 stated the following:

> "Hi ▮, would it be possible to get the FedEx out today or tomorrow so it delivers Tuesday or Wednesday, before the holiday?  I will be traveling the next 2 weeks.

Also a check for ▮▮▮ for 122K going out by FedEx tomorrow.  Thanks, Gene [DiNoto]."

▮▮▮▮ responded, "Absolutely.  I was going to send it today."  FedEx records showed that the next day, on November 21, 2017, DiNoto received a FedEx delivery at his residence from ▮▮▮▮▮.  In total, FedEx records showed that ▮▮, through ▮▮▮▮▮., sent DiNoto 107 packages to his residence over a five-year period from August 2015 to January 2020.  Investigators have not found any legitimate business reason for why ▮▮ would send packages to DiNoto's personal residence.

23.     A comparison of FedEx records with DiNoto's bank accounts did not reveal a pattern of check deposits following the receipt of FedEx packages from ▮▮, as happened with TB&D and Hartford.  However, it did reveal a pattern of cash deposits into Dinoto's bank accounts near in time to when DiNoto received the ▮▮ packages, often within hours on the same day. Below are examples of cash deposits subsequent to DiNoto's receipt of a FedEx packages from ▮▮

| Date and Time of FedEx Delivery | Date and Time of Cash Deposit | Amount of Cash Deposited |
| --- | --- | --- |
| October 10, 2018<br>10:08 am | October 10, 2018<br>12:53 pm | $4,000 |
| May 29, 2019<br>10:49 am | May 29, 2019<br>11:20 am | $1,030 |
| August 17, 2019<br>9:16 am | August 17, 2019<br>11:22 am | $6,000 |
| November 9, 2019<br>10:12 am | November 9, 2019<br>11:32 am and 11:33 am | $650 and<br>$3,000 |

24.     Based upon my training and experience and the foregoing facts, I believe there is probable cause to believe that ▮▮ like TB&F and Hartford, paid DiNoto a kickback representing a percentage of the inflated invoices that were approved by DiNoto and subsequently submitted to C&A for payment.  Furthermore, there is probable cause to believe that ▮▮ used cash to pay the

kickbacks, which were then delivered to DiNoto's residence via FedEx, all in violation of 18 U.S.C. § 1349.

### 3.    Tax Evasion[6]

####    a.    Eugene DiNoto

25.    Based on my training and experience and the facts set forth below, I believe DiNoto evaded paying taxes on income he received from the previously described scheme to defraud in years 2017 through 2019 by (1) failing to report the income received from the scheme; (2) using Sandpiper as a business front to conceal the scheme as the primary source of his income during those years; and (3) signing and submitting a false U.S. Form 1040 that substantially understated his tax liability, which created a corresponding tax deficiency.

26.    In 2008, DiNoto requested an employer identification number ("EIN") for Sandpiper from the IRS. According to records from the Maryland State Department of Assessments and Taxation, on February 24, 2011, DiNoto, as the chief executive officer, filed and signed a trade name application for Sandpiper, represented to be a consulting business. On the Schedule C for Sandpiper, Profit or Loss from Business ("Schedule C"), for the tax years 2013 and 2014, DiNoto reported his residential address as his business address.

27.    As detailed above, during the period of 2017 through 2019, there is probable cause to believe that TB&D and Hartford paid DiNoto more than $3.5 million for his role in the submission and approval of false drum invoices provided to C&A. The payments from those two drum vendors were in the form of checks made payable to "Sandpiper Enterprises," which DiNoto deposited into Sandpiper's bank account. A review of DiNoto's 2017 through 2019 income tax

---

[6] Title 26 U.S.C. § 7201 makes it a crime to willfully attempt to evade or defeat in any manner any federal tax imposed, including (1) federal income tax based on income after applicable deductions, expenses and credits; and (2) Federal Insurance Contributions Act (FICA) taxes, which are comprised of Social Security taxes and Medicare taxes.

returns filed with the IRS found no evidence that DiNoto reported any business income related to the kickback payments he received from the drum vendors, including the cash received from ███. Instead, DiNoto's primary source of reported income for years 2017 through 2019 was a Form W-2: Wage and Tax Statement ("W2") from C&A that listed his annual salary, which averaged about $88,000 per year.  In addition to his C&A wages, DiNoto reported a small profit or loss from the operation of an ice cream shop business ("A Chance of Flurries") for each of those years, thus demonstrating his knowledge of the legal requirement to report business income to the IRS.[7]  A summary of the Forms 1040 filed for tax years 2017-2019 is presented below:

| ITEM | 2017 | 2018 | 2019 |
|------|------|------|------|
| C&A W-2 Wages | $86,225 | $88,918 | $90,811 |
| Schedule C: ice cream shop profit/loss | ($43,857) | ($21,354) | $4,149 |
| Adjusted Gross Income – Form 1040 | $52,428 | $73,166 | $94,660 |
| **Reported Taxable Income – Form 1040** | **$3,153** | **$50,146** | **$71,556** |

---

[7] The Schedule C, Profit or Loss from Business (Sole Proprietorship), filed for the ice cream business ("A Chance of Flurries, LLC") in 2017-2019, listed DiNoto as the "Proprietor."  DiNoto also had signature authority over the business's bank account during those years.

28.     As noted above, the investigation revealed DiNoto opened and maintained three bank accounts at Harford Bank, one each for his two businesses, Sandpiper and Chance of Flurries, and one personal account jointly held with his wife.  DiNoto was listed as the sole signatory on the Sandpiper account, a joint signatory on the Chance of Flurries account, and a signatory on the personal account.  As set forth above, there is probable cause to believe from 2017 to 2019, DiNoto received payments from TB&D and Hartford that were not reported on DiNoto's 2017 to 2019 tax returns.  The following is a summary of the total amount of kickbacks paid by TB&D and Hartford that were deposited into DiNoto's bank accounts:

| Year | TB&D | Hartford | Total |
|------|------|----------|-------|
| 2017 | $913,171 | $261,658 | $1,174,829 |
| 2018 | $1,023,714 | $306,350 | $1,330,064 |
| 2019 | $1,119,496 | $310,125 | $1,429,621 |
| **Total** | | | **$3,934,514** |

29.     When the foregoing bank deposits and other financial records are compared to the income DiNoto reported on his Form 1040 filed for years 2017 to 2019, there is probable cause to believe that DiNoto willfully underreported his income in each of those years.  The amount of unreported income for those years and the resulting tax loss are set forth below:

| Year | Unreported Kickback Amount | Resulting Tax Loss |
|------|----------------------------|--------------------|
| 2017 | $1,174,829 | $430,495 |
| 2018 | $1,330,064 | $452,425 |
| 2019 | $1,429,621 | $491,874 |
| **Total** | **$3,934,514** | **$1,374,694** |

30.    A further review of DiNoto's tax filings showed that when he filed tax returns with the IRS for tax years 2011 to 2014, he reported Sandpiper as a Schedule C business.   On Sandpiper's Schedule C for those years, he reported a gross income for Sandpiper that matched the amount of income reported by a container vendor on a Form 1099-MISC: Miscellaneous Income (Form 1099-MISC).[8]  Those filings demonstrate his knowledge of the legal requirement to report business income to the IRS.

31.    DiNoto's knowledge that he was grossly underreporting his income was revealed in two C&A emails.   The first email, dated July 25, 2018, showed that DiNoto had completed a tenant application to rent his residence at 2008 Gumtree Terrace.  DiNoto noted on the application that he had been employed with C&A for over 20 years, and he listed $15,125 as his weekly salary/income with C&A, which is approximately $786,500 per year.   In the second email, dated February 18, 2019, DiNoto responded to a real estate agent about a house DiNoto was interested in viewing.   Upset that the current "[s]nooty stuck up owners" required a pre-approval letter, DiNoto stated, "I make just over a million dollars a year."

**b.    Elliott Kleinman**

32.    Based on my training and experience and the facts set forth below, I believe Kleinman evaded paying taxes on income he received from the previously described scheme to defraud in years 2017 through 2019 by (1) failing to report the income received from that scheme; (2) using his company EDK Management as a business front to conceal the scheme as the primary source of his income during those years; and (3) for each of those years, signing and submitting a

---

[8] Form 1099-MISC: Miscellaneous Income is an IRS form a taxpayer uses to report non-employee compensation to independent contractors, freelancers, sole-proprietors, and self-employed individuals. Recipients receive a Form 1099-MISC if they were paid $600 or more in a calendar year.

false U.S. Form 1040 that substantially understated his tax liability, which created a corresponding tax deficiency.

33.     According to Forms 1040 filed by Kleinman and his wife, Kleinman currently resides at **Subject Property 1.**   Kleinman is the sole owner of EDK Management, and he reports the company's income and expenses each year on a Schedule E, Income or Loss Partnership and S Corporations ("Schedule E)[9].   The company's business address is **Subject Property 1.**   For the years 2014 through 2019, Kleinman received Forms W-2 for minimal officer's compensation wages from EDK Management, ranging from $800 to $9,500.

34.     As detailed above, during the period of 2017 through 2019, TB&D and Hartford paid Kleinman more than $1 million for his role in the submission and approval of false drum invoices provided to C&A.  The payments from those two drum vendors were in the form of checks made payable to "EDK Management," which Kleinman deposited into EDK Management's bank account (4637).  A review of Kleinman's 2017 through 2019 income tax returns filed with the IRS found no evidence that Kleinman reported any business income related to the kickback payments he received from the drum vendors.  Kleinman's primary source of reported income for 2017 through 2019 was in the form of wages and flow through profit and losses from EDK Management and gambling winnings.   The electronically filed 2017 through 2019 Forms 1040 reflect the address of **Subject Property 1** and bear the electronic signature of Kleinman, all signed under the penalty of perjury.  A summary of those joint filed Forms 1040 returns is presented below:

---

[9] A Schedule E Income or Loss From Partnership and S Corporation is a schedule included in a Form 1040 to report the profit or loses from a pass-through entity.  Generally, Partnerships and S Corporations do not pay taxes, but rather "pass-through" their profit and losses to their partners or shareholders to report on their individual income tax returns.

| Item | 2017 | 2018 | 2019 |
|------|------|------|------|
| Form W-2: EDK Management | $2,260 | $88,918 | $90,811 |
| Schedule E: EDK profit/(loss) | ($2,260) | $19,235 | $41,571 |
| Other Income: Gambling Winnings | $134,837 | $43,806 | $39,885 |
| Adjusted Gross Income | $240,837 | $73,166 | $94,660 |
| Reported Taxable Income | $58,365 | $50,146 | $71,556 |

35. Regarding EDK Management's tax filings for years 2017-2019, Kleinman filed Forms 1120-S U.S. Income Tax Return for an S Corporation (Form 1120S) listing **Subject Property 1** as the company's business address. EDK Management reported it's "[b]usiness activity" as '[R]etail . . . tobacco products."[10] According to SDAT, EDK Management filed Articles of Incorporation in or around July 31, 1996. Kleinman, as the registered agent, filed Articles of Revival in or around May 14, 2006 after the charter was forfeited on October 8, 2004. On June 14, 2012, Kleinman, as the registered agent, filed a resolution to change the principal office to **Subject Property 1**. For tax years 2017 to 2019, EDK Management filed Form 1120S with the IRS reporting the following items:

| Item | 2017 | 2018 | 2019 |
|------|------|------|------|
| Gross Receipts | $779,495 | $801,921 | $837,113 |
| COGS: Purchases[11] | $453,282 | $453,989 | $382,823 |

---

[10] IRS Form 1120S is a tax document that is used to report the income, gains, losses, deductions, credits and other information of a domestic corporation or other entity for any tax year covered by an election to be an S Corporation.
[11] COGS is an abbreviation for Costs of Goods Sold.

| Section 179 Deduction[12] | $7,872 | $9,296 | $6,890 |
| Ordinary business Income (Loss) | $5,612 | $28,531 | $48,461 |

36.     Based on a review of EDK Management's bank records, the gross receipts reported on the company's Form 1120S for 2017-2019 as summarized above are from the company's sale of tobacco products under the trade name "Main Street Cigars" (**Subject Property 2**).  None of the reported gross receipts included the kickback payments from drum vendors TB&D and Hartford, which are summarized below:

| Year | Unreported Kickback Amount | Tax Loss |
|------|------|------|
| 2017 | $347,139 | $106,955 |
| 2018 | $351,331 | $92,026 |
| 2019 | $336,441 | $92,162 |
| **Total** | **$1,034,911** | **$291,143** |

Based on the foregoing facts, there is probable cause to believe that Kleinman willfully evaded the assessment of taxes on the vendor kickbacks he failed to disclose as income to the IRS.

### 4.     Money Laundering[13]

37.     Based upon my training and experience, a review of DiNoto's and Kleinman's banking activities revealed that they engaged in multiple acts of money laundering.  First, DiNoto and Kleinman conspired with TB&D and Hartford to make the kickback transactions appear as if Sandpiper and EDK Management were providing products or services to the two drum vendors.

---

[12] Section 179 Deduction, also called first-year expensing, is a write-off for purchases of equipment bought and placed into service in that year. This deduction is a separately state item required to be passed through to Shareholders of S-Corporations via the Schedule K-1.

[13] Title 18 U.S.C. § 1956(a)(1)(A)(ii)&(B)(i) prohibits making financial transactions using the proceeds of a specified unlawful activity, such as mail and wire fraud, "with intent to engage in conduct constituting a violation of [26 U.S.C.] §§ 7201 or 7206, or "knowing that the transaction is designed in whole or part - to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of the specified unlawful activity." Conspiracy to commit money laundering is prohibited under subsection (h) of 18 U.S.C. § 1956.

As discussed above, instead of paying DiNoto and Kleinman in cash for their share of C&A proceeds fraudulently obtained from the submission of inflated invoices, TB&D and Hartford regularly issued business checks from their companies payable to Sandpiper and EDK Management, which were then deposited into those companies' business accounts. This created the false appearance of a legitimate transactional history between the businesses. To bolster the pretense of those inter-business transactions, most of the checks had the word "drums" written in the memo section of the checks. Yet, as noted above, investigators could find no lawful business relationship between the two drum vendors and Sandpiper and EDK Management, *i.e.*, Sandpiper and EDK Management were not enterprises engaged in business activity that had any use for products or services provided by the drum vendors. Consequently, in my opinion, there is probable cause to believe that the four companies agreed to launder, and did launder, the proceeds of the scheme to defraud C&A by issuing and depositing checks under the guise of their sham business relationship, all with the intent to conceal the true source and nature of the money, as well as evade taxes.

38.    A review of the pertinent bank records showed that DiNoto and Kleinman committed additional acts of money laundering after they deposited the kickbacks into their respective business accounts. From 2017 through 2019, after DiNoto deposited the kickback checks into the Sandpiper account #7822, he would conduct subsequent financial transactions to transfer or deposit the illegal proceeds into the two personal bank accounts he held jointly with his wife at the same bank (#1223, #6671). For example, of the kickbacks totaling $1,148,564 deposited into the Sandpiper account #7822 in year 2017, $1,024,563 was transferred into personal account #1223, and $70,800 was transferred or deposited into #6671.[14] Once in those accounts,

---

[14] The transfer of the criminally derived proceeds from account #7822 into the other DiNoto accounts involved transactions greater than $10,000, in violation of 18 U.S.C. § 1957(a).

approximately $472,720 was withdrawn in cash and various personal expenses were paid, including $120,687 in car related expenses. DiNoto engaged in a similar pattern of financial transactions using the proceeds of the scheme to defraud in years 2018 and 2019.

39.     A review of the pertinent bank records for Kleinman showed that he used the EDK Management account #4637 as the primary repository for the kickbacks from 2017 through 2019. Once the illegal proceeds were in that account, he would conduct subsequent financial transactions. For example, Kleinman transferred some of the proceeds to a second EDK Management account #8195 that he opened at the same bank under the name "EDK Management Ltd. t/a Main Street Cigars" (**Subject Property 2**), which he used for depositing revenue from the sale of tobacco products and paying related expenses. The following proceeds were transferred from #4637 to #8195 during 2017 to 2019, respectively: $45,757; $74,557; and $52,823. By commingling the fraud proceeds with the sales proceeds in an account titled "Main Street Cigars," Kleinman used the retail tobacco business being conducted at **Subject Property 2** as a front to disguise the true source of the funds in EDK Management's bank accounts.

40.     Furthermore, Kleinman frequently withdrew the illegal proceeds from account #4637 as cash or via checks payable to himself. I know from my training, knowledge, and experience that criminals withdraw and use cash because it is untraceable. Based on Kleinman's commingling of the fraud proceeds with the revenue from his tobacco store described above, as well as the timing of cash transactions summarized below, I believe there is probable cause to believe that the withdrawal of cash from #4637 was another way for Kleinman to conceal the

source of the fraud proceeds, including the likelihood that some of the cash was subsequently used to support **Subject Property 2**, an instrumentality of his money laundering scheme.[15]

41.     For example, of the kickbacks totaling approximately $339,938 that Kleinman deposited into EDK Management account #4637 in year 2017, approximately $133,060 was withdrawn via checks payable to himself, $58,746 was withdrawn as cash, $111,410 was used to pay his home mortgage and other personal debt, and a total of $63,691 was transferred or deposited into account #8195 (the account for **Subject Property 2**) or spent on cigar related expenses.  Thus, in 2017 alone, Kleinman had access to a total of approximately $191,806 in cash, in addition to the $45,757 he transferred to **Subject Property 2's** bank account #8195.  Kleinman engaged in a similar pattern of transactions in 2018 and 2019.  Summarized below are three examples of when I believe, based upon the timing of the transactions, Kleinman withdrew cash from account #4637 for the purpose of depositing it into #8195 in order to secretly subsidize **Subject Property 2** and further launder the proceeds of the fraud.

      i.      On August 18, 2017, a cash withdrawal of $2,800 was debited from account #4637 at 12:03 pm.  On that same day and time, a cash deposit of $800 was credited to account #8195.

      ii.     On February 9, 2018, a cash withdrawal of $7,500 was debited from account #4637 at 10:08 am.  On that same day and time, a cash deposit of $7,500 was credited to account #8195.

      iii.    On July 15, 2019, a cash withdrawal of $2,000 was debited from account #4637 at 11:56 am.  On the same day at 1:01PM, a cash deposit of $1,000 was credited to #4637.

---

[15] Kleinman's tax records for 2017 to 2019 reflect taxable income and losses from legal gambling, some of which he deposited into account #4637.  However, the total amount of fraud proceeds deposited into the account during those years is substantially higher than the deposit of gambling proceeds.  The following are the approximate ratios of fraud proceeds versus gambling proceeds deposited in years 2017 – 2019, respectively: $340K/$171K; $338K/$24K; and $330K/$36K.

42.     Based on my training and experience, the foregoing facts show that from 2017 to 2019 DiNoto and Kleinman used their respective companies to illegally engage in financial transactions using the proceeds of the scheme.  Furthermore, by funneling the business checks received from TB&Q and Hartford through the Sandpiper and EDK Management business accounts, sometimes using additional bank accounts, and then cashing out those deposits or using them to pay personal expenses, DiNoto and Kleinman concealed the true nature and source of those funds, while also evading an accurate assessment of federal taxes on the receipt of those funds, in violation of 18 U.S.C. § 1956(a)(1)(A)(i)&((ii).

**D.     Probable Cause to Find Evidence at the Subject Properties**

43.     Based on the foregoing facts and my training and experience, there is probable cause to believe that evidence, fruits, and instrumentalities of the aforementioned criminal violations will be found at the **Subject Properties**.  As the principal business addresses for Sandpiper and EDK Management, as well as the destination points for the FedEx deliveries, the **Subject Properties** played a significant role in defrauding C&A and executing the laundering schemes.  The investigation established that for at least five years, dating back to 2015, DiNoto and Kleinman stayed in contact with representatives of the drum vendors by corresponding with them via emails and interstate deliveries in order to continuously generate illegal proceeds from the scheme.  That correspondence included the delivery of hundreds of FedEx packages to DiNoto's and Kleinman's residences.  As summarized above, those interactions involved the use of numerous documents and records, including FedEx envelopes, receipts, checks, deposit slips, bank statements, emails, handwritten notes, photographs of handwritten notes, emails, invoices, cash, etc.

44. The investigation also showed that business and financial records in the names Sandpiper, EDK Management, and Main Street Cigars were used to conceal the illegal proceeds of the scheme to defraud and evade taxes, including bank records and tax documents. Some of those records show that the proceeds of the fraud were used to buy personal items, pay personal expenses, and subsidize Kleinman's cigar shop (**Subject Property 2**).

45. Based on my knowledge, training, and experience, I know individuals engaged in fraud and tax evasion commonly maintain other records and documents associated with their criminal schemes. Such records are necessary for the individuals to track their income and expenses, manage their cash flow and assets, track their investments, pay their monthly bills and dispose of illegal proceeds. I know that people involved in schemes such as the one described above often maintain records, receipts, notes, ledgers, bank deposit receipts, money transfers receipts, credit card receipts, money order receipts, and other electronic data relating to their schemes, and commonly retain such records at their residence, workplaces, vehicles and/or other locations under their custody and/or control, such as the **Subject Properties**.

46. From my training and experience, I know that that persons involved in financial fraud often conceal in their residences, automobiles, businesses and storage facilities, large amounts of currency, financial instruments, precious metals, jewelry, and other items of value and/or proceeds of fraudulent activities and evidence of financial transactions relating to obtaining, transferring, concealing, or spending of large sums of money made from engaging in fraudulent activities.

47. Based on my training, knowledge and experience in conducting financial fraud investigations, I know that individuals and companies that engage in fraud, money laundering, and

tax evasion often use electronic means to send and store information that may constitute evidence of those criminal violations.

### E.     Computers, Electronic Storage and Forensic Analysis

48.     As described in Attachment B, this application seeks permission to search the **Subject Properties** for records related to those criminal violations in whatever form they are found.  One form in which pertinent records might be found is data stored on a computer, a hard drive, or other electronic storage media.  Thus, the warrant applied for authorizes the seizure of electronic storage media or, potentially, the copying of electronically stored information, under Rule 41(e)(2)(B).

49.     Your Affiant submits that if a computer storage medium is found in the **Subject Properties**, there is probable cause to believe records will be stored on that computer or storage medium for the following reasons:

a.     Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.     Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space-that is, in space on the storage medium which is not currently being used by an active file-for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.      Wholly apart from user-generated files, computer storage media-in particular, computer's internal hard drives-contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete evidence, because special software is typically required for the task.  However, it is technically possible to delete this information.

d.      Similarly, files that have been viewed via the internet are sometimes automatically downloaded into a temporary internet directory or "cache."

e.      As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when.  There is probable cause to believe this forensic electronic evidence will be on any computer located in the **Subject Properties** because:

i.      Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such a paragraph that has been deleted form a word processing file).  Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the

computer was in use.  Computer file systems can record information about the dates files were created and the sequence in which they were created.

ii.     Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium.  This "user attribution" evidence is analogous to search for "indicia of occupancy" while executing a search warrant at a residence.  For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat", instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

iii.    A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

iv.     The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium which are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

v.      Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present

on storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

50.     In most cases, a thorough search of premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant.  In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

a.     As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable.  As explained above, because the warrant calls for forensic electronic evidence, it is seemingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.  Storage media can store a large volume of information.  Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.     Computers can be configured in several ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the premises.  However, taking

the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

       c.      Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

       d.      Based on the foregoing, and consistent with Rule 41(e)(2)(B), when persons executing the warrant conclude that it would be impractical to review the media on-site, the warrant applied for herein would permit seizing or imaging storage media that reasonably appears to contain some or all of the evidence described in the warrant, thus permitting its later examination consistent with the warrant.

### F.      Conclusion

51.      Based on the foregoing facts, I request that the Court issue search warrants for the **Subject Properties**, which are further described in Attachment A, authorizing the seizure of the evidence, fruits, and instrumentalities set forth with more particularity in Attachment B, related to conspiracy to commit mail and wire fraud (18 U.S.C. §1349); money laundering (18 U.S.C. § 1956(a)(1)(A)(ii)&(B)(i)); and tax evasion (26 U.S.C. § 7201).

### G.      Request for Sealing

52.      I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Your affiant is not aware that the targets of this investigation know about your affiant's investigation, and if they did learn about it, they might flee, destroy evidence, or attempt to obstruct the investigation.  Your affiant is also concerned that premature disclosure of the existence of this search warrant application could endanger the safety of law enforcement

personnel attempting to execute the warrant. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize the investigation and/or the safety of law enforcement officers.

Respectfully submitted,

Daniel Rzepecki
Special Agent, Federal Bureau of
Investigation

Affidavit submitted by email and attested to me as true and accurate by telephone consistent with Fed. R. Crim. P. 4.1 and 41(d)(3) this ___8th___ day of September 2021.



Honorable J. Mark Coulson
United States Magistrate Judge
District of Maryland
Northern Division